Michael Delikat
James H. McQuade
Mayotta H. Anderson
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
(212) 506-5000

Attorneys for Defendants Wyeth Pharmaceuticals,
Inc. and Patricia Stalter

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH M. GIBSON,

       Plaintiff,

v.

WYETH PHARMACEUTICALS, INC., and
PATRICIA STALTER,

       Defendants.

07-CV-946 (SCR) (GAY)

**DEFENDANTS' RULE 56.1 STATEMENT**

Defendants Wyeth Pharmaceuticals, Inc. ("Wyeth") and Patricia Stalter, by their attorneys, Orrick, Herrington & Sutcliffe LLP, as and for their statement of material facts as to which there is no genuine issue to be tried, state as follows:

**Background**

1. Wyeth is a company engaged in the development and manufacture of pharmaceutical, consumer healthcare, and animal health products. Wyeth operates a pharmaceutical manufacturing facility in Pearl River, New York. Declaration of James Rowan ("Rowan Decl."), ¶¶ 1-2.

2. As a pharmaceutical manufacturing company regulated by the United States Food and Drug Administration, Wyeth is required to establish and follow certain standard operating procedures ("SOPs") relating to the manufacturing process. Rowan Decl., ¶ 3.

3. Plaintiff Joseph Gibson was hired by Wyeth in 1986. Declaration of James H. McQuade ("McQuade Decl."), Ex. 1, at 24.

4. Gibson was promoted several times during his employment at Wyeth. McQuade Decl., Ex. 1, at 50-57.

5. Gibson has been employed principally as a biological operator working directly on manufacturing operations at Wyeth's Pearl River facility. Rowan Decl., ¶ 4.

6. Operators like Gibson are union employees whose employment is governed by the terms of the contract between Wyeth and the International Chemical Workers Union, Local 143c (the "Union Contract"). Rowan Decl., ¶ 6; McQuade Decl. Ex. 1, at 247-48.

7. Defendant Patricia Stalter was employed at Wyeth's Pearl River facility for nearly 36 years, from 1971 through March 2008, when she terminated her employment. Declaration of Patricia Stalter ("Stalter Decl."), ¶ 1.

8. Stalter spent her entire career at Wyeth, working her way up from the position of messenger when she began her employment at the Pearl River facility at the age of 19 to the position of Principal Manager II which she held when she left Wyeth earlier this year. Stalter Decl., ¶ 2.

9. In July 2003, Stalter, then a manager in the Bulk Formulations Department, interviewed and hired Gibson for a position as a Biological Operator II on the first shift. McQuade Decl., Ex. 1, at 55-59, 63. Gibson held this position until March 2006. McQuade Decl., Ex. 1, at 59-61.

10. From July 2003 through March 2006, Gibson reported to a total of four different supervisors. McQuade Decl., Ex. 1, at 60-62.

11. On October 6, 2004, Gibson received an interview record, or a written warning, for poor performance relating to his failure to properly set up certain manufacturing equipment, which resulted in the flooding of a manufacturer room with water and chemicals. McQuade Decl., Ex. 1, at 187-88 & Ex. 11; McQuade Decl., Ex. 2, at 30-31.

12. Gibson does not disagree with anything in the interview record. McQuade Decl., Ex. 1, at 188-89.

13. Gibson does not believe that he was mistreated or discriminated against based on his race prior to October 26, 2004. McQuade Decl., Ex. 1, at 65.

**Stalter's Remark On October 26, 2004**

14. In October 2004, Stalter continued to work as a senior manager in the Bulk Formulations Department. Stalter Decl., ¶ 3.

15. Gibson worked as an Operator II, Production in that Department at the time, but did not report directly to Stalter. Stalter Decl., ¶ 3.

16. In early October 2004, Stalter watched a movie starring Morgan Freeman called "Lean On Me." Stalter Decl., ¶ 4.

17. In the movie, Freeman played a principal struggling to establish order in a troubled high school. To convey that he had authority over the school, Freeman referred to himself as the "head nigger in charge" or "HNIC" when arguing with the school superintendent and others. Stalter Decl., ¶ 4.

18. Stalter spoke about the movie with an African-American colleague from Wyeth, Francine Townsend. Stalter Decl., ¶ 4.

19. After watching the movie, some of Stalter's African-American colleagues, including Francine Townsend, used the "HNIC" phrase to refer to Stalter in jest on numerous occasions due to her position as a manager. Stalter Decl., ¶ 4.

20. Stalter had never heard of the phrase HNIC before watching "Lean On Me." Stalter Decl., ¶ 4.

21. On October 26, 2004, Stalter was running late when her boss, Associate Director Robert Holler, paged her as she was driving to work and directed her to come to his office at 7:45 am. Stalter called Holler on her cell phone and told him that she would not be in early and could not meet with him until after 8:00 am. Stalter Decl., ¶ 4.

22. When she met with Holler that morning, Holler informed Stalter that two outside contractors would be arriving that morning to go on a tour of 60B, the building in which Stalter and Holler worked, in connection with a project the contractors were working on. Holler also told Stalter that he expected her to assign a supervisor to work with them for an extended period of time, by noon that day. Stalter Decl., ¶ 5.

23. Holler and Stalter clashed frequently regarding management and other issues, and Stalter felt blindsided by his directive on October 26, 2004. Stalter Decl., ¶ 5.

24. Stalter did not appreciate either the lack of notice Holler provided her with regarding the contractors' impending arrival, nor the lack of information he gave her about their agenda and goals for the day. Stalter Decl., ¶ 5.

25. Since Stalter had found out about the project the contractors were working on only shortly before their arrival, she told them when she was introduced to them that she wanted to meet with them before they went on a tour of building 60B so that she could assess the scope of their project and assign the appropriate person to work with them. Stalter Decl., ¶ 7.

26. The two contractors refused Stalter's request to meet with her, telling her that they did not have time. Stalter Decl., ¶ 7.

27. Despite their rejection of her initial request, Stalter suggested that if they both did not have enough time to meet with her before their tour, perhaps one of them could do so after the tour. Again, the contractors denied her request and told Stalter that they were both going on a tour of the building. Increasing her frustration, they reiterated that Holler told them that Stalter would identify a supervisor to work with them by noon that day. Stalter Decl., ¶ 7.

28. Stalter felt that her efforts to understand the contractors' project and assign the best employee to work with them on it were being stonewalled by the lack of cooperation and support that she received from Holler and the contractors. Stalter Decl., ¶ 7.

29. Due to her ongoing frustrations with her boss and the increasing aggravation she felt when the contractors refused to briefly meet with her before going on a tour of the building, Stalter blurted out to the contractors that she was the "head nigger in charge" and told the contractors if they needed to get something done in 60B, they would have to go through her. Stalter Decl., ¶ 8.

30. When Stalter made the statement, she was referring to herself, and she did not intend to hurt anyone with the comment. Stalter Decl., ¶ 9.

31. Stalter used the phrase spontaneously and out of frustration, as she was trying to establish her authority and convey to the contractors that she was the person in charge. Stalter Decl., ¶ 9.

32. The phrase Stalter used was fresh in her mind, after having recently seen the movie "Lean on Me" and having heard it from her colleagues subsequently. Stalter Decl., ¶ 9.

33. Stalter understands that her use of the phrase was inappropriate, and she deeply regrets it. Stalter Decl., ¶ 10.

34. When Stalter used the phrase, she was standing near the door of the operators' office, and Gibson was seated at his desk. McQuade Decl., Ex. 1, at 74-77; Stalter Decl., ¶ 11.

35. Of the two rows of desks that are located in the operators' office, Gibson's desk did not face the hallway at the time, but rather the wall. Stalter Decl., ¶ 11.

36. Gibson was not involved with the conversation between Stalter, the supervisors and the outside contractors. McQuade Decl., Ex. 1, at 77.

37. According to Gibson, before Stalter used the phrase, she turned and looked at Gibson and said, "Excuse me Joe." McQuade Decl., Ex. 1, at 74-77. Stalter denies this. Stalter Decl., ¶ 34.

38. On October 28, 2004, Gibson sent Stalter an email, stating that he was a "little uncomfortable" with the statement Stalter had made to the two contractors. McQuade Decl., Ex. 1, at 80, 83 & Ex. 4.

39. Gibson further stated in his October 28 email that, although the statement had not been directed at him, he still found it offensive. McQuade Decl., Ex. 1, at 80, & Ex. 4.

40. Upon receiving the email, Stalter left a message on Gibson's answering machine, indicating that she would like to discuss this with him. McQuade Decl., Ex. 1, at 89-91; Stalter Decl., ¶ 14.

41. Stalter was extremely upset that her statement had offended Gibson because that was not her intent. Stalter Decl., ¶ 14.

42. The next day, Stalter invited Gibson to her office to talk to him about the statement she had made on October 26, 2004. McQuade Decl. Ex. 1, at 85-86; Stalter Decl., ¶ 14.

43. During this meeting, Stalter thanked Gibson for bringing the matter to her attention, told him that it was not her intention to offend him, and apologized for making the remark. McQuade Decl., Ex. 1, at 85-86; Stalter Decl., ¶ 14.

44. Stalter was emotional and crying when she apologized to Gibson during this meeting. McQuade Decl., Ex. 1, at 91; Stalter Decl., ¶ 14.

45. Gibson accepted Stalter's apology and the meeting ended peacefully. McQuade Decl., Ex. 1, at 86; Stalter Decl., ¶ 14.

46. Gibson testified that he was satisfied with the resolution at this point in time. McQuade Decl., Ex. 1, at 89.

47. Gibson did not report the incident to anyone else at Wyeth, but claims that another employee reported it to the Union and/or Wyeth's Human Resources Department. McQuade Decl., Ex. 1, at 88.

48. Shortly thereafter, James Rowan, the Associate Director, Site Labor Relations, for the Pearl River facility, launched an investigation into the comment made by Stalter. Rowan Decl., ¶ 14.

49. Rowan contacted Gibson and asked to meet with him about the incident. McQuade Decl., Ex. 1, at 87.

50. Gibson, Rowan, Nanci Perruna (a Wyeth employee and Union representative), and Jeff Gathers (the Vice President of the Union) met with Gibson about the incident. McQuade Decl., Ex. 1, at 87-89.

51. During this meeting, Gibson told Rowan that:

    a. he believed that Stalter's comment had not been directed at him;

    b. he believed that Stalter's comment was not intended to hurt anyone;

    c. Stalter had apologized to him;

    d. he believed that Stalter's apology was sincere.

McQuade Decl., Ex. 1, at 89-90; Rowan Decl., ¶ 15.

52. Thereafter, Rowan interviewed Stalter, who acknowledged that she had used the phrase attributed to her, and told him about her ongoing frustrations with Holler and the contractors. Rowan Decl., ¶ 16.

53. On December 1, 2004, Stalter was issued a written warning for behavioral misconduct. McQuade Decl., Ex. 2, at 33-35 & Ex. 1; Rowan Decl., Ex. 3; Stalter Decl., ¶ 16.

54. The written warning stated that Stalter's conduct was of "serious concern," that she had used "unacceptable language," and that she had violated Wyeth's Code of Conduct and its values. Rowan Decl., ¶ 18 & Ex. 3; Stalter Decl., ¶ 16.

55. The written warning also placed Stalter on notice that she could be terminated for any additional behavioral misconduct. Rowan Decl., ¶ 18 & Ex. 3; Stalter Decl., ¶ 16.

56. Although Wyeth managers seriously considered terminating Stalter's employment, it was ultimately decided that she would be issued a written warning based on factors including the context in which the comment was made, her length of service with Wyeth and her otherwise spotless disciplinary record. Rowan Decl., ¶ 17.

57. At some point in time after receiving the written warning, Stalter met with Gibson in the office of his supervisor, Cliff Piesco. Piesco and Nanci Perruna, a shop steward, also attended the meeting. McQuade Decl., Ex. 1, at 68-70, 91-92; Stalter Decl., ¶ 17.

58. Stalter requested the meeting to let Gibson know that she had been disciplined for the comment she made in October 2004, and that she wanted to clear the air with him, so that they could both move on. Stalter Decl., ¶ 17.

**Stalter's Request That Gibson Work A Few Hours Overtime On Two Days**

59. Under the Union Contract, union employees may be forced to work overtime in order of their union seniority. McQuade Decl., Ex. 1, at 102-04.

60. On one occasion, additional workers were needed to work a few hours of overtime, and Stalter selected those additional workers based on union seniority. McQuade Decl., Ex. 2, at 90-92.

61. Robert Margro had the lowest seniority in the area at the time, and, as a result, Stalter selected Margro to work the overtime. McQuade Decl., Ex. 2, at 94-95.

62. Margro responded by telling Stalter that he could not work the overtime because he had to take care of his children. McQuade Decl., Ex. 2, at 95.

63. Stalter asked Margro if he could make other childcare arrangements, and Margro explained that his wife was a nurse and was unavailable to watch the children. McQuade Decl., Ex. 2, at 96.

64. Because Margro did not have anyone else to watch his children, Stalter excused Margro from working overtime, but warned him that, in the future, if he could not work the mandatory overtime due to childcare responsibilities, it would be his responsibility to find a suitable replacement for himself. McQuade Decl., Ex. 1, at 104, 111; McQuade Decl. Ex. 2, at 96-97.

65. After this one occasion, Margro never again claimed that he could not work overtime due to childcare responsibilities. McQuade Decl., Ex. 2, at 97.

66. After Stalter excused Margro, she asked Gibson to work the overtime because he was the person with the lowest seniority after Margro. McQuade Decl., Ex. 2, at 92, 97-98, 102.

67. Gibson told Stalter he could not work the overtime because he had to pick up his pre-teen daughter from school. McQuade Decl. Ex. 1, at 110; McQuade Decl. Ex. 2, at 98.

68. Stalter responded by asking Gibson if he could make other arrangements, and Gibson responded that he could ask his mother. McQuade Decl. Ex. 1, at 110; McQuade Decl. Ex. 2, at 98.

69. Gibson then called his mother and reported to Stalter that she could pick up his daughter. McQuade Decl. Ex. 2, at 98. Thus, Gibson worked the overtime. McQuade Decl., Ex. 2, at 99.

70. On one other occasion, Stalter needed additional employees to work overtime for a few hours on the night shift. McQuade Decl. Ex. 2, at 103.

71. Stalter asked Gibson if he could work overtime, and Gibson responded that he could not work overtime on that night because he had to attend school. McQuade Decl., Ex. 1, at 103-06; McQuade Decl., Ex. 2, at 103.

72. Stalter then called Jim Rowan and asked Rowan whether attending school was a legitimate basis for excusing someone from mandatory overtime under the Union Contract. McQuade Decl. Ex. 2, at 104-06.

73. Rowan told Stalter that under the Union Contract, attending school was not a valid excuse for not selecting him to work overtime as the person with the lowest seniority. McQuade Decl., Ex. 2, at 105-06. Rowan suggested that Stalter let Gibson go to his class since Wyeth was paying for the class as part of Wyeth's employee tuition reimbursement program, but that, if another employee filed a grievance based on this preferential treatment of Gibson, Stalter

could not let Gibson use this excuse again in the future to avoid mandatory overtime. McQuade Decl. Ex. 1, at 106-08.

74.     Gibson admits that, when he complained that he could not work overtime because he had a class to attend that evening, he was excused from working overtime. McQuade Decl., Ex. 1, at 103-06.

### Gibson's Suspension For Sleeping On The Job

75.     On March 9, 2005, Stalter entered the operators' office and had a discussion with several employees. McQuade Decl., Ex. 2, at 107-08.

76.     As Stalter was leaving, one of the employees got her attention and pointed to Gibson, who was seated in a chair. The employee then put his hands together and leaned his head on the side of his hands, indicating that Gibson was sleeping. McQuade Decl. Ex. 2, at 107-08.

77.     Stalter observed Gibson with his head down for at least five minutes and assumed he was sleeping. McQuade Decl. Ex. 2, at 109.

78.     Gibson testified at his deposition that he was sitting at a desk, resting his head on his arm with his eyes closed, but denies he was sleeping. McQuade Decl., Ex. 1, at 72, 124-26.

79.     Stalter called Gibson's supervisor and asked him to come to the room. McQuade Decl. Ex. 2, at 108.

80.     Another employee banged Gibson's chair, and Gibson opened his eyes, lifted his head up, and sat up. McQuade Decl. Ex. 2, at 108.

81.     When Gibson lifted his head up, Stalter told Gibson to get a shop steward because he was sleeping. McQuade Decl. Ex. 2, at 109.

82. Before any discipline was issued, a union suspension hearing was held. McQuade Decl. Ex. 1, at 126-27.

83. Gibson was represented by Jeff Gathers, a Union Vice President, at the hearing. McQuade Decl. Ex. 1, at 127.

84. At the suspension hearing, Gibson explained that he had taken some medication that made him sleepy and groggy. McQuade Decl. Ex. 1, at 128-29.

85. At the conclusion of the hearing, an agreement was reached between the Union and Wyeth that Gibson would be suspended for three days. McQuade Decl. Ex. 1, at 129.

86. Stalter had observed another employee, Chris Jenderzick, sleeping at work on two occasions prior to 2004. McQuade Decl., Ex. 2, 112-15.

87. On one of those occasions, Stalter told Jenderzick to get a shop steward so that she could initiate discipline; Jenderzick claimed that he had been coming to work at 3:00 a.m. without getting paid and felt that therefore his sleeping should be excused; and Stalter ultimately decided to verbally reprimand Jenderzick and to warn him that he must stay awake on his shift.

88. On one other occasion, Stalter observed Jenderzick sleeping, and brought him to his supervisor, Andy Coyle, so that Coyle could discipline Jenderzick. Coyle issued Jenderzick a written warning. McQuade Decl. Ex. 2, at 111-15.

89. When Stalter learned that Coyle had only issued Jenderzick a warning notice, she told Coyle that she was upset that he had not sought more formal discipline. McQuade Decl. Ex. 2, at 115.

90. Stalter also observed Alfonso Purman, an African-American employee, sleeping on the job on two occasions: on the first occasion, she woke him up and yelled at him, and on the second occasion, she initiated disciplinary action with the Union, but the Union

representative talked her out of it and talked her into letting Purman immediately leave work that day without pay to get dental treatment because he was experiencing a severe tooth ache. McQuade Decl. Ex. 2, at 116-17.

91. The only other times Stalter has observed employees sleeping on the job was during manufacturing shut-down periods, when no work was occurring. McQuade Decl. Ex. 2, at 113-17. Stalter explained that, if she observed someone sleeping during these shut-down periods, she would let it go and did not seek to discipline the employee, although this practice changed at a later date after Gibson left the Department. McQuade Decl. Ex. 2, at 118.

92. Prior to 2004, Stalter's office was on a different floor from the operators' offices. In or around 2004, the operators' offices were moved to the same floor as Stalter's office and were located just around the corner, so that Stalter had to walk by the operators' offices to get to her office. McQuade Decl., Ex. 1, at 173-74.

93. Stalter never instructed any of the supervisors in Bulk Formulations Department to closely watch Gibson's behavior. McQuade Decl., Ex. 2, at 127.

94. On or about April 15, 2005, Gibson filed a charge of discrimination with the Equal Employment Opportunity Commission. McQuade Decl., Ex. 1, & Ex. 16.

### February 2006 Written Warning

95. In February 2006, Gibson received an interview record, or a written warning, from two supervisors, Pam Sarro and John Borek, for poor job performance because he had failed to complete all of the required paperwork for a particular batch of Prevnar® on October 7, 2005, documenting that he had cleaned a Ph probe after the batch had been manufactured. Declaration of John Borek ("Borek Decl."), ¶¶ 8-9.

96. By not completing all of the required paperwork on this occasion, Gibson violated Wyeth's SOPs as a pharmaceutical manufacturing facility regulated by the FDA which require the operator responsible for cleaning the Ph probe to complete paperwork documenting that he or she has done so while the cleaning is being performed. McQuade Decl., Ex. 1, at 156-57 & Ex. 5; Rowan Decl., ¶ 3; Borek Decl., ¶¶ 6, 8-10.

97. Gibson's poor performance on this occasion did not come to light until November 16, 2005 when an investigation was initiated after a problem with the probe that Gibson had been assigned to clean on October 7, 2005 was discovered. Borek Decl., ¶¶ 8-9.

98. As part of the investigation into the problem with the probe, the documentation assigned to the three batches in which this probe had been used and the documentation issued for this particular batch was collected and reviewed, and Gibson's failure to complete all of the required documentation was discovered. Borek Decl., ¶ 9.

99. Ph probes are glass devices used in the manufacture of Prevnar® to measure the Ph level of the vaccine. A serial number is assigned to every Ph probe used in the Prevnar® manufacturing process. Each Ph probe may be used to manufacture a maximum of three batches of Prevnar®. Borek Decl., ¶ 5.

100. Gibson felt that his receipt of the interview record was unfair, because another employee, Francine Townsend, who was working with him on October 7, 2005 and who is African-American, was not similarly disciplined. McQuade Decl., Ex. 1, at 158. Borek Decl., ¶ 11.

101. Gibson believes that Townsend did not receive a warning for this incident because Townsend is Stalter's best friend. McQuade Decl., Ex. 1, at 160.

102. Wyeth did not discipline Townsend in this instance because while it was Townsend's responsibility to check any completed paperwork that Gibson provided to her for this batch, it was not her responsibility to complete the paperwork. Borek Decl., ¶ 11.

103. Stalter had no involvement with the decision to issue the interview record. McQuade Decl., Ex. 1, at 159-60.

104. The interview record did not negatively impact Gibson in any way. McQuade Decl., Ex. 1, at 155-56.

105. Gibson filed a grievance with the Union, claiming that the discipline was unwarranted and unfair, and his grievance was denied at three, separate levels of the grievance process, before the Union withdrew the grievance on January 22, 2007. McQuade Decl., Ex. 1, at 161-62, 167 & Ex. 6; Borek Decl., ¶ 12.

### Wyeth's Harassment Policies

106. Wyeth has had a written policy against unlawful discrimination during all times relevant to this case. Rowan Decl., ¶ 7.

107. The purpose of Wyeth's discrimination policy is to ensure that all employees are permitted to work in an environment free from any type of unlawful discrimination or harassment. Rowan Decl., ¶ 8.

108. Under Wyeth's current policy, any "act, threat or complaint of sexual or other unlawful harassment must be reported to either the employee's supervisor, Human Resources department or Wyeth Human Resources, who will make a full investigation of the matter." Rowan Decl., ¶ 9.

109. In addition to conducting a complete investigation, Wyeth's policy states that it will "promptly investigate all complaints" and will take appropriate action if Wyeth determines

at the conclusion of an investigation that unlawful harassment or discrimination occurred. Rowan Decl., ¶ 9.

110. Further, Wyeth "urges its employees to report any incidents of retaliation immediately" and informs its employees in Exhibit 1 that it "will investigate and resolve reports of retaliation in the same manner as reports of harassment and other discrimination." Rowan Decl., ¶ 9.

111. Wyeth's policy against unlawful discrimination is also included in Wyeth's Code of Conduct. Rowan Decl., ¶ 10.

112. Gibson received a copy of Wyeth's Code of Conduct and had access to it on the firm's internet HR portal. McQuade Decl. Ex. 1, at 260-62 & Ex. 24-25.

113. In addition, Wyeth posts its policies against unlawful harassment in memoranda on bulletin boards at the entrances and exits of the Pearl River plant, and at designated buildings throughout the site. Rowan Decl., ¶ 11.

114. Gibson received a copy of Wyeth's Unlawful Harassment and Discrimination policy. McQuade Decl., Ex. 1, at 263-64 & Ex. 26.

115. On October 26, 2004, Gibson attended a facility-wide training program on Wyeth's Code of Conduct, which included training relating to unlawful harassment and discrimination. McQuade Decl. Ex. 1, at 78-79, 261, 264.

116. Nanci Perruna, Eric Randby, and Jeff Gathers were not employed by Wyeth as supervisors, managers, or Human Resources Department representatives, and therefore, were not proper recipients of complaints of discrimination or retaliation under Wyeth's anti-discrimination policy. Rowan Decl., ¶ 19.

Dated: New York, New York
November 10, 2008

        ORRICK, HERRINGTON & SUTCLIFFE LLP

        By: *[signature]*
            Michael Delikat
            James H. McQuade
            Mayotta H. Anderson
            666 Fifth Avenue
            New York, New York 10103
            (212) 506-5000

        Attorneys for Defendants Wyeth Pharmaceuticals,
        Inc. and Patricia Stalter