UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

JOSEPH GIBSON,

        Plaintiff,

  -v-

WYETH PHARMACEUTICALS, INC., and
PATRICIA STALTER,

        Defendants.

---------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___ 0 9 MAR 2011

No. 07 Civ. 946 (LTS)(GAY)

LAURA TAYLOR SWAIN, UNITED STATES DISTRICT JUDGE:

## MEMORANDUM OPINION AND ORDER

        Plaintiff Joseph Gibson ("Gibson" or "Plaintiff") brings this action against Wyeth

Pharmaceuticals, Inc., ("Wyeth") and Patricia Stalter ("Stalter," collectively "Defendants")

pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") and the New York

State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 ("Section 296"). Against

Wyeth, Plaintiff asserts claims for unlawful race-based discrimination, retaliation, and hostile

work environment. (Count I, Compl. ¶¶ 57-58.) Plaintiff asserts a second claim against Stalter

only, alleging that she "aided, abetted, incited, compelled and/or coerced" Wyeth's conduct in

violation of Section 296(6). (Count II, Compl. ¶ 59.) Defendants now move for summary

judgment.

        The Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. §§

1331 and 1343, and supplemental jurisdiction of his state law claims pursuant to 28 U.S.C. §

1367.

For the following reasons, Defendants' motion is granted in its entirety.

## BACKGROUND

The following facts are undisputed unless otherwise stated. Wyeth is a global pharmaceutical company, which operates a manufacturing facility in Pearl River, New York. (Defs.' Rule 56.1 Statement ("Defs.' 56.1") ¶ 1.[1]) Wyeth hired Plaintiff in 1986. (Id. ¶ 3.) Gibson's employment is governed by the terms of a union contract between Wyeth and the International Chemical Workers Union, Local 143c (the "Union"). (Id. ¶ 6.) At the time of the events in this lawsuit, Gibson, who is African American, was employed as a biological operator in the Pearl River facility. (Id. ¶ 5.) Patricia Stalter was employed at Wyeth's Pearl River facility from 1971 through March 2008, when she terminated her employment. (Id. ¶ 7.) During the relevant time period, Stalter, who is Caucasian, was a senior manager in the Bulk Formulations Department. (Id. ¶¶ 9, 14.) In July 2003, she interviewed and hired Gibson for a position as Biological Operator II. (Id. ¶ 9.) Gibson held this position until March 2006, when he applied and was granted a transfer to another department. (Morelli Decl. in Opp. to Defs.' Mot. for Summ. J. ("Morelli Decl.") Ex. 2, Dep. of Joseph M. Gibson ("Gibson Dep.") 168:14-22.) From July 2003 through March 2008, Gibson reported to four different supervisors, and Stalter was a senior manager overseeing the entire department. (Id. ¶¶ 9-10.)

The October 26, 2004 Incident

On October 26, 2004, Stalter was informed that two outside contractors would be visiting her department to take a tour of the building. (Id. ¶¶ 21-22.) Stalter was directed by her

---

[1]     Citations to the parties' statements pursuant to Local Civil Rule 56.1 incorporate by reference the evidence identified therein.

boss to assign a supervisor by noon who would assist the contractors with their project. (Id. ¶ 22.) When Stalter met with the contractors in the morning, she asked that they meet with her either before or after the tour to explain to her the scope of their project. (Id. ¶ 25.) The contractors informed her they did not have time to meet with her at all during the day. (Id. ¶¶ 26-27.) In response, Stalter stated to the contractors that she was the "head nigger in charge" ("HNIC Statement") and that, if the contractors needed to get something done in that building, they would have to go through her. (Id. ¶¶ 28-29.) While the statement was not directed at the Plaintiff, he was in the operator's room and overheard Stalter's statement. (Id. ¶¶ 35-36; Decl. of James Rowan in Supp. of Defs.' Mot. for Summ. J. ("Rowan Decl.") Ex. 2.) Gibson  was the only African American in the room at the time. (Pl.'s Counter-Statement Pursuant to Local Rule 56.1 ("Pl.'s 56.1 Counter-Statement") ¶ 16.) According to Plaintiff, Stalter turned to him before making the HNIC Statement, and said, "Excuse me Joe." (Id.) Stalter denies having prefaced the HNIC Statement with "Excuse me Joe." (Defs.' 56.1 ¶ 37.)

On October 28, 2004, Plaintiff emailed Stalter concerning the incident. (Id. ¶ 38.) In the email, Gibson stated that he "was a little uncomfortable" with the HNIC Statement made to the two contractors. (Id. ¶ 38; Rowan Decl. Ex. 2.) While, he said, the statement "was not directed" at him, he still found it to be "offensive," especially "being the only Afro American in the room." (Rowan Decl. Ex. 2.) Upon receiving the email, Stalter left a message on Plaintiff's home answering machine stating that she would like to discuss the incident with him. (Defs.' 56.1 ¶ 40.) The next day, Stalter met with Gibson in her office to discuss the HNIC Statement. (Id. ¶ 42.) At the meeting, a very emotional Stalter apologized to Gibson for her comment. (Id. ¶ 44.) Gibson accepted her apology, and testified later that he was satisfied with the resolution of

the matter. (Id. ¶¶ 45-46.) Plaintiff did not report the incident to Wyeth's human resources department; however, another colleague reported it to the Union and it eventually became known to Wyeth's human resources department. (Id. ¶ 47.) James Rowan, Associate Director for Site Labor Relations at the Pearl River facility, contacted Gibson and requested that he forward to him the email he had sent previously to Stalter. (Id. ¶ 48; Pl.'s 56.1 Counter-Statement ¶ 48.)

Soon afterward, Rowan held a meeting with Gibson and two union representatives to discuss the incident. (Defs.' 56.1 ¶ 50.) At this meeting, Gibson told Rowan that Stalter had apologized to him, that she was near tears when she apologized, and that he believed her apology to be sincere. (Id. ¶ 51; Gibson Dep. 90:8-25.) Thereafter, Rowan interviewed Stalter, who admitted she had used the HNIC Statement. (Defs.' 56.1 ¶ 52.) On December 1, 2004, Stalter was issued a written warning for behavioral misconduct. (Id. ¶ 53.) The warning placed Stalter on notice that she "[would] be terminated" if her "behavioral misconduct [was] not immediately corrected and sustained thereafter." (Rowan Decl. Ex. 3.) After Stalter was disciplined, she held a meeting with Gibson, Nanci Perruna, a shop steward, and Gibson's direct supervisor, Cliff Piesco, to inform Gibson that she had been disciplined for her actions. (Defs.' 56.1 ¶ 57.) According to Gibson, Stalter looked at him before the meeting began and said that she had "asked God to help her" forgive Plaintiff "for what [he had] done." (Gibson Dep. 93: 5-10.) Stalter denies having made this statement; rather, she maintains that she requested the meeting only to "clear the air with him" (Defs.' 56.1 ¶ 58) and that she "shared with him that [she] had prayed about the incident and asked God to help [her] through it" because she knew that Gibson, like herself, was a "religious person" (Stalter Decl. ¶ 17).

Mandatory Overtime

Pursuant to the Union contract, employees may be required to work mandatory overtime. (Defs.' 56.1 ¶ 59.) Employees are selected for overtime in order of their seniority. (Id.) At the time of these events, Plaintiff was the second most junior employee in the department. (Id. ¶ 66.) Plaintiff alleges that he was requested twice to work overtime, and cites the requests as evidence of racial discrimination and retaliation for complaining about the HNIC Statement. On the first occasion, an additional employee was needed to work overtime in the Bulk Formulations Department. (Id. ¶ 60.) Stalter asked Robert Margo, the most junior employee in the department, to work the overtime. (Id. ¶ 61.) Margo told Stalter that he was unable to work the overtime because he had to care for his children. (Id. ¶ 62.) Stalter asked Margo if he could make other child-care arrangements so that he could work the overtime, and he told her there was no one available to watch his children. (Id.) Because Margo could not make other arrangements, Stalter excused him from the overtime. (Id. ¶ 64.) Stalter then asked Gibson, the second most junior employee, if he could work the overtime. (Id. ¶ 66.) Gibson told her that he was unable to work the overtime because he had to pick up his daughter from school. (Id. ¶ 68.) Stalter asked Gibson if he could make other arrangements, and he told Stalter that he could ask his mother to pick up his daughter. (Id.) Gibson called his mother, was able to make arrangements, and worked the overtime. (Id. ¶ 69.)

On the second occasion, employees were needed to work overtime on the night shift. (Id. ¶ 70.) Stalter asked Gibson, the most junior employee in the department at the time, if he could work the overtime, and Gibson informed her that he was attending night school and had a class that evening. (Id. ¶¶ 71, 73.) Stalter called Jim Rowan and asked whether attending

school was a permissible basis for excusing an employee from mandatory overtime. (Id. ¶ 72.)
Rowan informed her that attending school was not a valid excuse under the Union contract;
however, Wyeth was paying for Gibson's night school as part of its employee tuition
reimbursement program and Rowan suggested that Stalter allow Gibson to be excused on this
occasion, but say that he would not be excused for classes in the future. (Id. ¶ 73.) Therefore, on
this second occasion, Gibson did not work the overtime.

## The March 2005 Suspension

On March 9, 2005, Stalter observed Gibson with his head down at his desk and
assumed he was sleeping. (Id. ¶ 77.) According to Gibson, he did not feel well and was resting
with his head on his arms and his eyes closed, but he was not sleeping. (Pl.'s 56.1 Counter-
Statement ¶ 75.) One of Plaintiff's co-workers tapped Plaintiff on the back, and when he lifted
his head Stalter instructed him to go and get a union shop steward because he had been caught
sleeping on the job. (Id.; Defs.' 56.1 ¶¶ 80-81.) A suspension hearing was held. (Defs.' 56.1 ¶
82.) Gibson was represented at the hearing by Jeff Gathers, the Union vice president. (Id. ¶ 83.)
At the hearing, Gibson denied having been asleep, but explained that he had not been feeling
well and had been taking medication that made him sleepy. (Id. ¶ 84; Gibson Dep. 128: 9-17.)
At the conclusion of the hearing, the Union and Wyeth reached an agreement that Gibson would
be suspended for three days.[1] (Defs.' 56.1 ¶ 85.) Gibson alleges that Stalter has observed other
employees in similar situations sleeping on the job and treated those employees differently.
(Compl. ¶ 47.) Plaintiff admits that he is unaware as to whether or not these other employees

---

[1]     The record is unclear as to whether the three-day suspension was with or without pay.
Plaintiff does not request damages for the suspension, but rather, asserts that the
suspension is evidence of disparate treatment and retaliation by Stalter.

were disciplined for their conduct.  (Pl.'s 56.1 Counter Statement ¶¶ 87-90.)

February 2006 Interview Record

In February 2006, Gibson received an "interview record"[2] from two supervisors, Pam Sarro and John Borek, for poor job performance because, on October 8, 2005, Gibson had failed to complete properly all of the required paperwork documenting that he had cleaned a Ph probe in the lab.[3]  (Defs.' 56.1 ¶¶ 95-96.)  This paperwork is required by Wyeth's SOPs and FDA regulations.  On November 16, 2005, Wyeth initiated an investigation when it found a broken Ph probe.  (Id. ¶ 97.)  While investigating the broken probe, Wyeth discovered that Gibson had failed to complete properly all the paperwork documenting that he had cleaned the probe.  (Id. ¶ 98.)  As a result, Wyeth issued Gibson the interview record.  There was no additional discipline.  (Id. ¶ 104.)  After receiving the interview record, Gibson filed a grievance with the Union, which was denied at the first three levels of the grievance process.  (Id.)  On January 22, 2007, the Union withdrew Gibson's grievance instead of appealing it further.  (Id. ¶ 105.)

DISCUSSION

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of establishing the absence of any genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct.

---

[2]     An interview record is a written warning.  (Rowan Decl. ¶ 8; Gibson Dep. 154:2-3.)

[3]     Ph probes are glass devices used to measure the Ph level of vaccines.  (Defs.' 56.1 ¶ 99.)  Plaintiff was involved in manufacturing the Prevnar® vaccine.  (Id. 95.) A serial number is attached to each probe and, according to Wyeth's standard operating procedures ("SOPs"), each probe may only be used to manufacture a maximum of three batches.  (Id. ¶ 99.)

2505, 91 L. Ed. 2d 202 (1986). For the purposes of summary judgment, a fact is material "if it 'might affect the outcome of the suit under the governing law.'" Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson, 477 U.S. at 248). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id.

The party opposing summary judgment may not rest on mere allegations of contested facts, but must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); cf. Fed. R. Civ. P. 56(c)(1) (amended Dec. 1, 2010⁴) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.") "Conclusory allegations, conjecture and speculation" do not establish a genuine issue of fact, and thus will not provide a sufficient basis for a nonmoving party to resist summary judgment. Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998). The facts must be viewed in the light most favorable to the party opposing the motion, and all reasonable inferences must be drawn in the nonmovant's favor. Am. Cas. Co. v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir. 1994). A court must be "especially cautious" in an employment discrimination case, when "the employer's intent is at issue." Kerzer, 156 F.3d at 400 (citing Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1224 (2d

---

⁴ Federal Rule of Civil Procedure 56 was amended on December 1, 2010. The version in effect at the time the instant motion was briefed includes the language cited in the text. The current version is cited herein as well.

Cir.1994)).

Gibson alleges that his forced overtime work was the product of racially-based disparate treatment and that it was imposed in retaliation for his complaints about the HNIC Statement. Further, he alleges that he was disciplined more severely than other employees because he is black, and also that the discipline he received was retaliatory. The same assertions underlie Plaintiff's hostile work environment claim.

Plaintiff's claims, brought pursuant to Section 1981 and Section 296, are evaluated under the three-step burden shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000); Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000); Borrero v. Am. Express Bank, Ltd., 533 F. Supp. 2d 429, 442 (S.D.N.Y. 2008). The first step under McDonnell Douglas requires that Plaintiff proffer evidence establishing a prima facie case. 411 U.S. at 802; see, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). The plaintiff's burden at the prima facie stage is minimal. Cooper v. State of Conn. Pub. Defenders Office, 208 F. App'x 24 (2d Cir. 2008).

The second step shifts the burden to the employer to offer some legitimate, non-discriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 802. "This burden is one of production, not persuasion; it can involve no credibility assessment." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (internal citation and quotation marks omitted). At this stage, the employer does not need to prove that the challenged action was not the product of discrimination, but must provide a clear

and specific explanation for the action.  Gibbs v. Consol. Edison Co. of N.Y., 714 F. Supp. 85, 89 (S.D.N.Y. 1989).  The presumption of discrimination arising from the prima facie case drops out upon such a proffer of a legitimate, non-discriminatory reason.

The burden then shifts back to the plaintiff to offer proof that would enable a reasonable fact finder to conclude that defendant's proffered reason was a pretext for prohibited discrimination.  Reeves, 530 U.S. at 143;  accord Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000).  A plaintiff may rely at the rebuttal stage on the same facts used to establish the prima facie case so long as a preponderance of the evidence would allow a reasonable fact finder to find that a discriminatory violation has occurred.  Holtz, 258 F.3d at 78.  However, a plaintiff's own conclusory allegations will not be sufficient to overcome proffered evidence substantiating the defendant's non-discriminatory rationale for its actions.  See Jasmin v. Dep't of Labor, No. 04 Civ. 10237, 2007 WL 1746909, at *8 (S.D.N.Y. June 15, 2007).

The Court will address each of Plaintiff's claims under the McDonnell Douglas framework, beginning with Gibson's claims of unlawful race discrimination.

Plaintiff's Race Discrimination Claim

Gibson's discrimination claim relies upon a theory of disparate treatment.  He alleges that he was forced to work overtime because he was black while white employees were excused from overtime.  Gibson further alleges that he was disciplined for allegedly sleeping at work, while white employees who were observed sleeping were not disciplined similarly. Gibson also asserts that he was reprimanded on another occasion for failing to complete required documentation while another employee working the same shift was not disciplined.

In accordance with McDonnell Douglas, the Court looks first to whether Plaintiff

has established a prima facie case evidencing discrimination.  To establish a prima facie case of

discrimination, Plaintiff must show that (1) he is a member of a protected class; (2) he was

qualified for the position held; (3) he suffered an adverse employment action; and (4) the

circumstances surrounding the action gave rise to an inference of discrimination.  Hicks, 509

U.S. at 506.  The first two points are not disputed; Plaintiff is a member of a protected class and he

was qualified for the position.

The "adverse employment action" must be material, that is, "more disruptive than

a mere inconvenience or an alteration of job responsibilities.  Instead, a materially adverse

change must be of the order of a termination of employment, a demotion evidenced by a decrease

in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished

material responsibilities, or the like." Shapiro v. New York Dep't of Educ., 561 F. Supp. 2d 413,

422 (S.D.N.Y. 2008) (citing Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)

(internal quotations omitted)).  Here, the record, read in the light most favorable to Plaintiff,

cannot support a finding that Plaintiff suffered an "adverse employment action." See Young v.

Rogers & Wells LLP, No. 00 Civ. 8019, 2002 WL 31496205, at *5 (S.D.N.Y. Nov. 6, 2002)

(granting summary judgment where plaintiff failed to establish an adverse employment action).

Gibson was required to work overtime on a single occasion.  Working a single day

of overtime is not a "materially adverse change in the terms and conditions of employment."

Galabya, 202 F.3d at 640 (internal quotation omitted).  The work requirement did not affect or

change the conditions of Gibson's employment at all.  In fact, working overtime was a condition

of his employment under the Union contract.  The second time that Gibson was asked to work

overtime, Stalter allowed him to be excused.  Clearly, if even working forced overtime on a

single occasion is insufficient to constitute an adverse employment action a mere request, with no required work, cannot establish the adverse employment action prong of the prima facie case.

Further, even if the Court were to treat the first overtime incident as an adverse employment action, Gibson's proffer is insufficient to establish the fourth element of his prima facie case with respect to the overtime work requirement. For a disparate treatment claim, Plaintiff "need only show that he was replaced by someone outside his protected class or show that a similarly situated employee was treated differently than him, though the prima facie proof required in a given case ultimately depends on the specific facts in question." Cretella v. Liriano, 633 F. Supp 2d 54, 71 (S.D.N.Y. 2009) (citing McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001)).

The record does not reveal any rational basis for an inference of discrimination related to the overtime incident. The underlying facts are not in dispute. Gibson was the second most junior employee in the department. On the one day when Gibson worked overtime, Stalter had asked Margo, the most junior employee, to work the overtime first. Margo was unable to work the overtime and was excused, and only then did Stalter ask Gibson to work the overtime. Defendants proffer that Margo had informed Stalter that he was unable to work the overtime because he was unable to arrange alternative child care coverage. (Decl. of James H. McQuade in Supp. of Defs.' Mot. for Summ. J. ("McQuade Decl.") Ex. 2, Dep. of Patricia Stalter ("Stalter Dep.") 96:6-11.) Plaintiff denies knowledge of the conversation. (Gibson Dep. 111:17-20.) Plaintiff acknowledges that, when asked whether he could make alternative child care arrangements, he indicated that he could ask his mother and that, when he was directed to ask, he was able to make the arrangements. (Gibson Dep. 110:14-25.) All employees, in order of

seniority, must work mandatory overtime as provided for under the Union contract, which governed Gibson's employment. Plaintiff's conclusory allegation that he and Margo were treated differently because of race is insufficient to support an inference that the work requirement was imposed on him for discriminatory reasons. Accordingly, Plaintiff has failed to establish his prima facie case with respect to his claim of discriminatory imposition of mandatory overtime.

Gibson's second claim of discriminatory treatment arises from the discipline imposed on him for allegedly sleeping on the job. Gibson argues that he was suspended for three days for allegedly sleeping while other, white, co-workers were not similarly treated when caught sleeping on the job. Here too, Plaintiff fails to establish a prima facie case of discrimination because he has not demonstrated that he suffered an adverse employment action that rose to the requisite level of materiality. While it is unclear whether he was paid during the three-day period of suspension, there is no dispute that he returned to work and continued in the same position, with the same pay and under the same terms of employment, after the suspension. (Gibson Dep. 129:15-17.) The mere fact that an employment action is adverse does not automatically make it material; rather the "adverse employment action" must work "a substantial alteration in the terms and conditions of a person's employment." Dobrynio v. Central Hudson Gas & Electric Corp., 419 F. Supp. 2d 557, 564 (S.D.N.Y. 2006) (holding that a suspension for a single day was not a material adverse employment action); see also Polanco v. 34th St. P'ship, Inc., 724 F. Supp. 2d 420, 426 (S.D.N.Y. 2010) (holding that a one-day suspension was not a material adverse employment action). There is no evidence of record from which a rational fact finder could conclude that, under these circumstances, the suspension worked such an alteration in the terms and conditions of Plaintiff's employment.

Nor has Gibson proffered evidence from which the requisite inference of discrimination could properly be drawn. Gibson asserts conclusorily that similarly situated white employees were observed sleeping on the job and were not disciplined. Although, at his deposition, he identified four other individuals whom he claimed Stalter had observed sleeping but did not treat in the same manner, Gibson acknowledged that he did not know whether three of the other individuals had been disciplined or not, and proffered no evidence that any of the white employees whom Stalter had allegedly observed sleeping had in fact been spared discipline. (Gibson Dep. 130-137.) The only additional evidence concerning the circumstances of these individuals is Stalter's testimony that she took one of the white sleeping employees to his direct supervisor, who to Stalter's displeasure only issued him a written warning, and that Stalter verbally reprimanded another black employee for sleeping and then on a second occasion took the matter up with the Union representative, who convinced her that the employee should be allowed to leave early for medical reasons. (Stalter Dep. 114-17.) Thus, there is no record evidence of disparate treatment of similarly situated black and white employees from which the required inference of discrimination could properly be drawn.

Plaintiff has also failed to establish a prima facie case of discrimination with regard to the interview record. A negative performance review, standing alone, does not constitute an adverse employment action. See Frankel v. City of New York, Nos. 06 Civ. 5450, 07 Civ. 3436, 2009 WL 465645, at *3 (S.D.N.Y. Feb. 25, 2009) ("Plaintiff's negative performance evaluations do not constitute adverse employment actions."); Meder v. City of New York, No. 05 Civ. 919, 2007 WL 1231626, at *12 (E.D.N.Y. Apr. 27, 2007) (holding that "written and oral criticisms . . . even if unjustified, are not adverse employment actions"). In

Frankel, this Court held that negative performance evaluations that did not lead directly to
"negative economic consequences and reduced professional opportunities" were not adverse
employment actions. 2009 WL 465645, at *3 n.1. Cf. Shapiro, 561 F. Supp. 2d at 423
(concluding that plaintiffs' negative performance evaluations directly led to, inter alia, being
removed from paid positions). Gibson does not, and cannot, allege that he suffered any material
negative consequences as a result of the interview record. Plaintiff identifies only speculative
possible adverse consequences of a negative evaluation, none of which transpired in his case.
The record, reviewed in the light most favorable to Plaintiff, thus reveals that he cannot establish
the adverse employment action prong of the prima facie case in connection with the interview
record.

Even if Plaintiff were deemed to have tendered a prima facie case with respect to
any of his claims of disparate treatment, summary judgment in Wyeth's favor would still be
warranted as to all claims, because Wyeth has proffered legitimate non-discriminatory reasons
for the complained-of conduct and Plaintiff has failed to rebut that showing by raising any
genuine dispute of material fact as to pretext. Defendants have proffered legitimate, non-
discriminatory reasons for each of the three negative actions. As to the mandatory overtime
claim, Defendants have provided uncontroverted evidence that Plaintiff was the second-least
senior employee in the department, and that he was asked to work overtime, in accordance with
the Union contract, when the least senior employee was unable to work the shift. As to the
suspension for sleeping, Gibson testified that he was feeling unwell, and acknowledged that he
was sitting at his desk, holding his head in his hands with his eyes closed. (Gibson Dep. 125:6-
8.) Gibson was provided a pre-suspension hearing where he was represented by the Union. At

the end of the hearing, the suspension was imposed on the basis of an agreement between Wyeth and the Union representative, acting on Gibson's behalf.  Finally, as to the interview record, Defendants have shown that Gibson was disciplined for failing properly to complete paperwork mandated by Wyeth SOPs and FDA regulations.  Gibson filed a grievance with the Union, which was denied at three levels of the grievance process before the Union withdrew his complaint.  (Defs.' 56.1 ¶ 105.)  Wyeth has met its burden of proffering legitimate non-discriminatory reasons for the actions.

The final step shifts the burden to Plaintiff to offer proof that would enable a rational jury to conclude that defendants' proffered reasons were only pretexts for prohibited discrimination.  Reeves, 530 U.S. at 143; accord Schnabel, 232 F.3d at 88.  Plaintiff fails to offer any evidence of pretext.  He only reiterates his own conclusory allegations, which are insufficient to overcome Defendants' proffered evidence.  See Jasmin, 2007 WL 1746909, at *8.  There is no evidence from which a rational jury could conclude that he suffered any adverse employment actions that were the product of any discriminatory animus.  See Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); Cardozo v. Healthfirst, Inc., 210 F. Supp. 2d 224, 234 (S.D.N.Y. 1999) ("Conclusory allegations made by the Plaintiff of (alleged) discriminatory conduct are insufficient to avoid summary judgment.").  The Court concludes that Plaintiff has failed to frame any genuine dispute of material fact as to whether he suffered race-based discriminatory treatment and that Wyeth is entitled as a matter of law to summary judgment dismissing his race discrimination claims under Section 1981 and the NYSHRL.

## Plaintiff's Retaliation Claim

In addition to his discrimination allegations, Gibson claims the forced overtime,

three-day suspension, and interview record were imposed in retaliation for reporting Stalter's

HNIC Statement. To set forth a prima facie case of retaliation, a plaintiff must show that (1) he

engaged in a protected activity, (2) the defendants were aware of that activity, (3) he suffered an

adverse employment action, and (4) a causal connection existed between the protected activity

and adverse employment action. Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68,

126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006); accord Kessler v. Westchester Cnty. Dept. of Soc.

Servs., 461 F.3d 199. 205-06 (2d Cir. 2006); Manoharan v. Columbia Univ. College of

Physicians and Surgeons, 842 F.2d 590, 593 (2d Cir. 1998).[5] "The anti-retaliation law 'protects

an individual not from all retaliation, but from retaliation that produces an injury or harm.'"

Fincher, 604 F.3d at 721 (quoting Burlington, 548 U.S. at 67).

Plaintiff has failed to make out a prima facie retaliation case with respect to his

claims regarding forced overtime and the interview record; even assuming that the record

concerning the suspension is sufficient to establish a prima facie case on that claim, Plaintiff has

failed to rebut Defendant's proffer of a legitimate non-discriminatory reasons for the imposition

---

[5]     Section 1981 encompasses claims of retaliation. CBOCS West, Inc., v. Humphries,
553 U.S. 442, 457, 128 S. Ct. 1951, 170 L. Ed. 2d. 864 (2008). The same analytical
framework applies to retaliation claims brought pursuant to the NYHRL and Section
1981. See, e.g., Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 720
(2d Cir. 2010) ("Retaliation claims made under 42 U.S.C. § 1981, like those made
under Title VII, are evaluated using a three-step burden-shifting analysis."); Blanc v.
Sagem Morpo, Inc., No. 09-3762-cv, 2010 WL 3836155, at *2 (2d Cir. Oct. 1, 2010)
("The same framework applies to . . . retaliation claims brought pursuant to the New
York State Human Rights Law . . . and pursuant to 42 U.S.C. § 1981); Cruz v. Coach
Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000) ("Our consideration of claims
brought under the state . . . human rights laws parallels the analysis used in Title VII
claims.").

of the suspension.

> In order to establish the adverse employment action element of a retaliation claim:
>
> [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. We speak of <u>material</u> adversity because we believe it is important to separate significant from trivial harms.

<u>Burlington</u>, 548 U.S. at 68 (internal quotations and citations omitted, emphasis in original).[6] As explained above, Gibson was required, on a single occasion, to work mandatory overtime in accordance with his Union contract. This clearly does not constitute "material" adversity as defined by <u>Burlington</u>. Working overtime because you are one of the more junior employees falls within the category of "petty slights or minor annoyances that often take place at work and that all employees experience." <u>Burlington</u>, 548 U.S. at 68.

Plaintiff fails, furthermore, to make the requisite showing of a causal connection between his complaint regarding the HNIC Statement and the interview record. The record, viewed in the light most favorable to Plaintiff, does not reveal any connection between the interview record and Gibson's prior complaint about Stalter. The undisputed evidence of record demonstrates that the paperwork discrepancy documented in the interview record came to light as a result of a review that was triggered by the discovery of a broken probe early in 2006. The paper trail for the broken probe was traced back, and Plaintiff's improper completion of the cleaning paperwork was revealed at that time. No evidence has been proffered that Stalter played

---

[6]      The Supreme Court in <u>Burlington</u> defined "adverse employment action" in the context of a Title VII retaliation claim. As noted above, the same analysis applies here.

any role in the discovery of the probe or the initiation or conduct of the investigation, nor that either of the supervisors involved – Sarro and Borek – was aware of Plaintiff's internal complaint about the HNIC Statement. Under these circumstances, Plaintiff's conclusory allegations that the interview record was the product of a retaliatory program by Stalter to subject him to higher-than-usual scrutiny is insufficient to provide the requisite inference of retaliation as a causal factor in the creation of the interview record. See Mack v. Otis Elevator Co., 326 F.3d 116, 129 (2d Cir. 2003) (granting summary judgment on retaliation claim because decision maker had no knowledge of plaintiff's protected activity). Nor is the fact that Plaintiff's co-worker was not disciplined sufficient to supply the requisite inference of retaliation. The evidence is undisputed that Plaintiff was responsible for the creation of the record, and that the co-worker was merely responsible for review of the records. Furthermore, Plaintiff himself alleges that the co-worker was spared discipline because of her personal relationship with Stalter.

Because the suspension was the result of a process initiated upon a report (post-dating the HNIC Statement and Gibson's complaint about it) by Stalter that she had observed him sleeping while on duty, the Court assumes for purposes of this analysis that Plaintiff can satisfy the causal connection prong of the prima facie case. The adverse employment action prong is satisfied under the Burlington standard. The Court thus turns to the second and third steps of the burden-shifting analysis. As explained above, the undisputed record evidence demonstrates that, following Stalter's report, an investigation process was undertaken, including a pre-suspension hearing at which Plaintiff had Union representation, and that the suspension was imposed pursuant to an agreement between Wyeth and Gibson. Nothing in the record could, under these circumstances, support a rational inference that the agreed suspension was a pretext

for retaliation.

Wyeth is, accordingly, entitled as a matter of law to summary judgment dismissing Plaintiff's retaliation claims.

Plaintiff's Hostile Work Environment Claim

Plaintiff asserts that he was subjected to a hostile work environment.[7]  In order to establish a hostile work environment claim, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (internal quotation omitted); see also Fincher, 604 F.3d at 723-24.  The plaintiff must subjectively experience the working environment as abusive and the Court must be satisfied objectively that it is abusive.  See Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004); Hayut v. State Univ. of N.Y., 352 F.3d 733, 745 (2d Cir. 2003).

Generally, isolated instances of harassment are insufficient to form the basis for a finding of a hostile work environment. Rather, the employee must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents was sufficiently continuous and concerted, to have altered the conditions of his working environment.  Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000).  In determining whether the proffered

---

[7]    Section 1981 and Section 296 hostile work environment claims are evaluated under the same analytical framework as such claims brought under Title VII. See Fincher v. Depository Trust and Clearing Corp., No. 06 Civ. 9959, 2008 WL 4308126, 5 (S.D.N.Y. Sept. 18, 2008), aff'd, 604 F.3d 712 (2d Cir. 2010).

evidence is sufficient to establish the requisite alteration of the employee's working environment, the Court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. Additionally, courts consider the totality of the circumstances in evaluating the work environment. Quinn v. Green Tree Credit Corp., 159, F.3d 759, 767 (2d Cir. 1998). Indeed, the Supreme Court has described the standard for asserting hostile work environment claims as demanding; courts are to avoid construing federal law as a "general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998); see also De La Rosa v. City of N.Y. Police Dept., No. 09 Civ. 5290, 2010 WL 4177626, at *7 (S.D.N.Y. Oct. 22, 2010) ("The standard for a hostile work environment claim is 'demanding.'") In Faragher, the Supreme Court made clear that "conduct must be extreme to amount to a change in the terms and conditions of employment." 524 U.S. at 788.

Having considered the totality of the circumstances, taking as true the evidentiary facts proffered by Plaintiff and drawing all reasonable inferences in his favor, the Court concludes that Plaintiff has not tendered evidence sufficient to support a rational fact finder's conclusion that he suffered a hostile work environment at Wyeth. As the Supreme Court noted in Harris, "'mere utterance of an . . . epithet which engenders offensive feelings in a employee,' . . . does not sufficiently affect the conditions of employment to implicate Title VII." 510 U.S. at 21 (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)); accord Schwapp v. Town of Avon, 118 F.3d 106, 110-11 (2d Cir. 1997). To prove a hostile work environment claim on the basis of racial comments, Plaintiff must show

"more than a few isolated incidents of racial enmity." Snell v. Suffolk Cnty., 782 F.2d 1094, 1103 (2d Cir. 1986). "[W]hether racial slurs constitute a hostile work environment typically depends upon 'the quantity, frequency, and severity' of those slurs . . . considered 'cumulatively in order to obtain a realistic view of the work environment.'" Schwapp, 118 F.3d at 110-11 (quoting Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 444 (7th Cir.1994); Vore v. Indiana March 8, 2011Bell Tel. Co., 32 F.3d 1161, 1164 (7th Cir.1994)).

Here, the only explicitly racial comment identified by Plaintiff is the HNIC Statement, which Plaintiff's own email message acknowledges was not addressed to him. Plaintiff also alleges, and Defendants deny, that Stalter said "Excuse me Joe" immediately before she made the HNIC Statement, and that she later told Plaintiff that she had "asked God to help her forgive" Plaintiff "for what [he had] done." These alleged statements, taken as having been made, and construed in the light most favorable to Plaintiff, are insufficient to demonstrate the alteration of Plaintiff's working conditions that is required to establish a hostile working environment based on race and/or retaliation. Nor (for substantially the reasons explained above in connection with Plaintiff's discrimination and retaliation claims) do the overtime, three-day suspension and interview record suffice, when combined with the remarks, to demonstrate sufficiently severe incidents or a set of pervasive conditions constituting a hostile work environment.

Wyeth is therefore entitled to judgment as a matter of law dismissing Plaintiff's hostile work environment claim as well.

NYHRL § 296(6) Aiding and Abetting Claim

The only claim that Plaintiff asserts against Stalter is as an "aider and abettor" of unlawful discrimination under NYHRL § 296(6). However, liability as an accessory may only be found where a primary violation has been established. JG & PG ex rel. JGIII v. Card, No. 08 Civ. 5668, 2009 WL 2986640, at *13 (S.D.N.Y. 2009) ("Because Plaintiffs have no claim against Defendant-District, they cannot claim that Defendant-Superintendent and Defendant-Principal aided and abetted illegal discrimination by Defendant-District in violation of NYHRL § 296(6)."). Therefore, because Plaintiff has failed to establish his underlying claims against Wyeth, summary judgment must be granted in Stalter's favor on Plaintiff's Section 296(6) claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety. The Clerk of Court is directed to enter judgment in Defendants' favor and close this case. This Memorandum Opinion and Order resolves docket entry no. 9.

SO ORDERED.

Dated: New York, New York
March 9, 2011

LAURA TAYLOR SWAIN
United States District Judge